# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

WILLIAM A. KLICH,

        Plaintiff,

     v.                                         Case No. 05-C-1262

GABE'S CONSTRUCTION COMPANY,

        Defendant.

## DECISION AND ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### I.  PROCEDURAL BACKGROUND

The plaintiff, William A. Klich ("Klich"), commenced this action by filing a complaint alleging that the defendant, Gabe's Construction Company ("Gabe's"), terminated his employment in violation of the Americans with Disabilities Act, 42 U.S.C. § 12102 et seq. ("ADA"), the Family and Medical Leave Act, 29 U.S.C. § 2601 et seq. ("FMLA"), and the Age Discrimination in Employment Act, 29 U.S.C. § 621 et seq. ("ADEA").  More particularly, Klich alleges that Gabe's refused to return him to his former position or to a comparable position after taking time off to recover from knee surgery and, in doing so, violated the afore-stated federal statutes.

On November 16, 2006, the defendant filed a motion for summary judgment.  The motion is now fully briefed and is ready for decision.  For the reasons which follow, the defendant's motion for summary judgment will be granted.

## II. FACTUAL BACKGROUND

In accordance with the provisions of Civil Local Rule 56.2(a) (E.D. Wis.), the defendant's motion for summary judgment was accompanied by a set of proposed findings of fact. Likewise, the plaintiff's response to the defendant's motion for summary judgment was also accompanied by a set of proposed findings of fact. The parties have also filed a joint stipulation of facts. A review of the parties' stipulation of facts, respective proposed findings, and the responses thereto reveal that the following are material and (except where noted) undisputed facts that are relevant to the disposition of the defendant's motion for summary judgment.[1]

Gabe's is a Sheboygan-based corporation which provides underground utility services and fiber optic maintenance services. (Defendant's Proposed Findings of Fact ("DPFOF") at ¶ 1.)

---

[1] The court notes that, in its response to the plaintiff's statement of facts, the defendant states as follows:

> Rather than respond in detail to each factual proposition presented by Klich, Gabe's opts to respond only to those factual propositions which are key to the court's consideration of this summary judgment motion. This response should not be construed as a stipulation or acknowledgment of any sort related to the factual propositions which are not addressed. To the contrary, it should be assumed that any factual propositions which are not addressed herein are disputed by Gabe's. Gabe's opts not to focus on these disputed issues at this time because the court is currently at the summary judgment stage of the proceedings.

Civil L.R. 56.2(c) provides that "[t]he movant may also respond to the opposing party's proposed finding of fact in accordance with the provisions of subparagraph (b)(1) of this rule." In turn, Civil L.R. 56.2(b)(1) provides, in pertinent part, that a response [under Civil L.R. 56.2(b)] should include "[a] specific response to the movant's proposed findings of fact, clearly delineating only those findings to which it is asserted that a genuine issue of fact exists." Gabe's seems to be attempting to unilaterally change the local rule to fit its preferred method of presenting its argument. This it cannot do. Thus, in accordance with Civil L.R. 56.2(e), "the Court must conclude that there is no genuine material issue as to any proposed finding of fact to which no response is set out" by Gabe's in its response to the plaintiff's proposed findings of fact.

2

Gabe's is generally required by union contracts to employ union members from trades including laborers, operators, Teamsters, and steamfitters. (DPFOF at ¶ 2.)

Klich was a member of the Laborers Union Local #1086 from 1968 until 1983. During this time he worked as a laborer on underground utility construction projects for Gabe's. (DPFOF at ¶ 3.)

From 1983 to the present, Klich has been a member of Steamfitters Union Local #601 (the "Union") (Stipulation of Facts (SOF) at ¶ 1.) From 1983 until January 2, 2004, Klich worked as a welder/foreman on underground utility construction projects for Gabe's. His duties included welding and joining of pipe, lifting supplies, entering and exiting trenches, laying out stakes for the work, driving pilings, maintaining equipment, loading and unloading equipment, locating utilities, digging ditches, and various other activities. (DPFOF at ¶ 4.)

In August of 2003, Klich experienced pain in both knees and went to see Dr. John Livermore. Dr. Livermore told Klich that he would probably need knee surgery. (DPFOF at ¶ 5.) Klich was physically able to work for Gabe's despite pain and some alteration of his work tasks until he had knee replacement surgery. (Plaintiff's Proposed Findings of Fact (PPFOF) at ¶ 2.) During his last three years of employment with Gabe's, Klich rarely had to exit and enter job sites, and his work did not require any kneeling. (PPFOF at ¶ 3.) Welding casing pipe was the only job assignment ever assigned to Klich which required a measurable amount of kneeling, namely up to two hours per week. (PPFOF at ¶ 4.)

Prior to Klich's knee surgery he had difficulty sleeping due to the knee pain and could not engage in hobbies such as fishing. His knee pain made it uncomfortable to walk, and he experienced pain when he knelt. (PPFOF at ¶ 5.)

3

On January 2, 2004, Klich, as working foreman, laid himself off of work with Gabe's and completed a lay off slip. (DPFOF at ¶ 6.) The parties disagree over the reason Klich laid himself off. The defendant contends that Klich laid himself off due to a lack of work, as evidenced by the layoff slip he filled out. (DPFOF at ¶ 6; Klich, Ex. 3.) The plaintiff contends that he laid himself off so he could have knee surgery. (Plaintiff's Response to DPFOF at ¶ 6.)

On January 12, 2004, Klich had double replacement knee surgery. (DPFOF at ¶ 7.) He did not fill out any family medical leave paperwork for the surgery. (DPFOF at ¶ 7.) Klich contends that he informed Gabe's that he was going on layoff for knee replacement surgery. (PPFOF at ¶ 9.)

Klich was unable to work from January 12, 2004 until April 8, 2004 while he was recovering from his surgery. (PPFOF at ¶ 10; DPFOF at ¶ 8.) He received short term disability payments pursuant to the Wisconsin Pipe Trades Health Fund short term disability plan from January 12, 2004 until April 11, 2004. Klich received a total payment of $3,900.00 for short term disability. (DPFOF at ¶ 8.)

On March 12, 2004, Klich attended a safety meeting for Gabe's employees. (DPFOF at ¶ 9.) The parties dispute whether Klich was invited or attended on his own initiative. Klich turned in a release for light duty work to Gabe's safety director Greg Gabrielse. (PPFOF at ¶ 13.)

On April 8, 2004, Klich received a return to work report with the following restrictions: permanent restriction for no kneeling; caution with heavy lifting over 50 pounds; caution with heavy carrying while descending stairs. (DPFOF at ¶ 10.) Klich provided the April 8, 2004 work restriction to Greg Gabrielse. (DPFOF at ¶ 11.) Klich and Greg Gabrielse did not have a discussion about the work restrictions. (DPFOF at ¶ 11.)

4

On April 19, 2004, Klich provided his Union with a medical release which stated that he was released to return to work but had a permanent lifting restriction of not more than 50 pounds and a permanent kneeling restriction of no kneeling. (SOF at ¶ 2.) On April 19, 2004, Klich was placed on the Union hiring list which made him available to be hired by all Union employers. (SOF at ¶ 3.) Klich also applied for a position with Consumer Care Products, Inc., in Plymouth, Wisconsin, but was not offered the position. (PPFOF at ¶ 29.)

On May 4, 2004, the Union presented Klich with a job offer by leaving a message on his answering machine. Klich did not respond to the Union's message. (SOF at ¶ 4.)

On June 30, 2004, Klich signed a worker's compensation hearing application.[2] Klich's worker's compensation claim was settled and he received proceeds in the amount of $31,107.50. (DPFOF at ¶ 16.)

On July 13, 2004, Klich completed an application for retirement benefits and sent the application to the Building Trades United Pension Trust Fund. (DPFOF at ¶ 17.)

On July 19, 2004, the Union presented Klich with another job offer, which was not from Gabe's. Klich rejected the job offer. (DPFOF at ¶ 18.)

From April 12, 2004 until August 2004, Klich received unemployment compensation totaling $8,540.00. His eligibility for unemployment compensation ran out in August 2004. (DPFOF at ¶ 19.)

---

[2]The defendant contends that the hearing application stated that Klich was temporarily totally disabled from January 9, 2004 to June 30, 2004. (DPFOF at ¶ 16.) Klich denies that the form stated this. (Plaintiff's Response to DPFOF at ¶ 16.)

5

On August 16, 2004, Klich called Steamfitters Local #601 and told the Union that he was retiring effective September 1, 2004. (SOF at ¶ 6.) The Union changed Klich to retired status effective September 1, 2004. (SOF at ¶ 8.)

From September 1, 2004 to the present, Klich has been receiving a pension from the United Building Trades Pension Fund. In 2004, Klich received pension benefits totaling $9,381.40. In 2005, Klich received pension benefits totaling $28,144.20. Klich also received social security payments in 2005 totaling $5,036.00. (DPFOF at ¶ 21.)

At some point between Labor Day of 2004 and September 19, 2004, Klich voluntarily and, not pursuant to any request by Gabe's, returned to Gabe's all of Gabe's property which was in his possession. This included his work truck. (DPFOF at ¶ 22.)

From April 19, 2004 to the present, Klich has not been employed by any Union employers. (SOF at ¶ 7.) Klich did not file a grievance against Gabe's under his union contract. (DPFOF at ¶ 24.)

From April 8, 2004 to the present, Klich does not believe that the condition of his knees has created any problems for him in regards to caring for himself, walking, working, or performing manual tasks. (DPFOF at ¶ 25.)

The parties dispute whether Gabe's gave meaningful consideration to recalling Klich for any jobs after his knee surgery. According to the defendant, from the time it received Klich's April 8th return to work slip until Klich's retirement, Gabe's considered Klich for work that it had available. Moreover, in evaluating whether Klich was suitable for the work available, Gabe's claims that it took into account the requirements of union contracts, Klich's skills, Klich's work restrictions, Klich's qualifications, Klich's licenses and certifications, and other job related requirements. In addition,

6

Gabe's assumed that Klich was able to work and sought to find the right project for him, and Gabe's permitted Klich to retain his truck and other corporate property pending his anticipated recall. (DPFOF at ¶ 27.)  Finally, Gabe contends that after considering these factors on a project by project basis, Gabe's was not able to find a position for Klich from April 8, 2004 until Klich's retirement. (DPFOF at ¶ 28.)  Klich disputes that Gabe's took these steps.  (Plaintiff's Response to DPFOF at ¶ 27-28.)

There was normally year round work available for Klich with Gabe's.  When field work slowed down, Klich normally welded in Gabe's Sheboygan shop.  (DPFOF at ¶ 19.)

At the time Klich sought to return to work there was shop welder work available at Gabe's because a shop welder was on leave for an injury and there was shop welding work that needed to be done.  (PPFOF at ¶ 22.)

In June of 2004 Gabe's had shop welding work available for a natural gas project.  Gabe's called in Tracy Thiel, who had never worked in Gabe's Sheboygan shop, was 19 years younger than Klich at the time, and had 17 years less experience working for Gabe's than Klich.  (PPFOF at ¶ 23.)

Gabe's employed the following men as foremen on projects between April 8, 2004 and December 31, 2004, even though they had fewer years of service with Gabe's than Klich: Mark Bord, David Brace, Steven Breher, Dale Dhein, Walter Hansen, Mike Heibing, Dimitrios Lagios, Stefan Meisner, Rusty Ott, Dagoberto Reta, Larry Snyder, Terry Weber, Al Wipperman, and Richard Ziegler.  (PPFOF at ¶ 24.)  All were younger than Klich except for Larry Snyder.  (PPFOF at ¶ 25.) Only Larry Snyder and Alan Wipperman were classified as foremen as of April of 2004.  (PPFOF at ¶ 26.)

7

Gabe's president and CEO, Timothy Gabrielse ("Gabrielse"), was unable to recall during his deposition whether any other trade employees were permanently laid off in 2004. (PPFOF at ¶ 27.) Gabrielse was also unable to say whether there was work available for Klich in 2004, if he had been cleared of all restrictions. (PPFOF at ¶ 28.)

Klich lost pension benefits as a result of his not returning to work for Gabe's. If Klich had worked another 12 months for Gabe's, he would have qualified for an additional $236.37 per month in pension benefits. If he had worked an additional 24 months from the time of his last pension contribution, he would have earned an additional $481.12 per month. If Klich had worked until his normal retirement date of August 31, 2006, he would have received an additional $625.62 per month. (PPFOF at ¶ 34.)

When Klich began receiving his retirement benefits the Union moved him from the out of work list to the retired list. (PPFOF at ¶ 35.) Union members on the retired list are still eligible to be called for work either directly by an employer or by the Union. (PPFOF at ¶ 36.)

### III. SUMMARY JUDGMENT STANDARDS

A district court must grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)) (quoting Fed. R. Civ. P. 56(e) advisory committee's note to 1963 amendment). "Summary Judgment is not appropriate 'if the evidence is such that a reasonable jury

8

could return a verdict for the nonmoving party'" *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A party opposing a properly supported summary judgment motion "may not rest upon the mere allegations or denials of the adverse party's pleading" but rather must introduce affidavits or other evidence to "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see also Outlaw v. Newkirk*, 259 F.3d 833, 837 (7th Cir. 2001). To state it differently, "[a] party will be successful in opposing summary judgment only when they present definite, competent evidence to rebut the motion." *EEOC v. Sears, Roebuck & Co.,* 233 F.3d 432, 437 (7th Cir. 2000) (quoting *Smith v. Severn*, 129 F.3d 419, 427 (7th Cir. 1997)).

To determine whether genuine issue of material fact exists, the court must review the record, construing all facts in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor. *Heft v. Moore*, 351 F.3d 278, 282 (7th Cir. 2003) (quoting *Anderson,* 477 U.S. at 255). "'In the light most favorable' simply means that summary judgment is not appropriate if the court must make 'a choice of inferences.'" *Draghi v. County of Cook*, 184 F.3d 689, 691 (7th Cir. 1999) (quoting *Smith*, 129 F.3d at 425). "The evidence must create more than 'some metaphysical doubt as to the material facts.'" *Albiero v. City of Kankakee*, 246 F.3d 927, 932 (7th Cir. 2001) (quoting *Johnson v. University of Wisconsin-Eau Claire*, 70 F.3d 469, 477 (7th Cir.

9

1995)). A mere scintilla of evidence in support of the nonmovant's position is insufficient. *Id.* (citing *Anderson*, 477 U.S. at 252).

Thus, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

## IV. DISCUSSION

### A. ADA Claim

The ADA forbids certain employers from "discriminat[ing] against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). A "qualified individual with a disability" is defined as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8).

In order to establish a prima facie case for discrimination, Klich must show that (1) he is disabled under the ADA; (2) he is qualified to perform the essential functions of his job, with or without reasonable accommodation; and (3) he has suffered from an adverse employment decision because of the disability. *Buie v. Quad/Graphics, Inc.*, 366 F.3d 496, 503 (7th Cir. 2004).

"If an ADA plaintiff establishes a prima facie case, the burden shifts to the employer to offer a legitimate nondiscriminatory reason for the employment decision. *Nese v. Julian Nordic Constr. Co.*, 405 F.3d 638, 641 (7th Cir. 2005) "If the employer succeeds, then the burden reverts to the

10

plaintiff to show that there is a genuine dispute of material fact that the proffered reason for the employment action is pre-textual." *Id*.

As stated above, to establish a prima facie case for discrimination, Klich must first demonstrate that his condition qualifies as a disability within the meaning of the ADA. "Disability," as used in 42 U.S.C. § 12111(8), is defined as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2).

Klich contends that, prior to his knee surgery, as a result of osteoarthritis in both of his knees he was impaired in walking, bending, using stairs, and other activities using his legs. His condition also interfered with his ability to sleep. (Pl.'s Br. at 3.) However, Klich has acknowledged that from April 8, 2004 to the present, the condition of his knees has not created any problems for him in regards to caring for himself, walking, working, or performing manual tasks.

"Major life activities" refer "to those activities that are of central importance to daily life." *Toyota Motor Mfg., Kentucky, Inc. v. Williams*, 534 U.S. 184, 197 (2002). Walking is a "major life activity"; so too is "performing manual tasks" *Id.* at 197. Sleeping is also a major life activity. *Burks v. Wis. DOT*, 464 F.3d 744, 757 (7th Cir. 2006). Bending, kneeling, and climbing stairs may also be major life activities. *See Gilbert v. Nicholson*, 2007 U.S. Dist. LEXIS 5415, *20 (N.D. Ill. 2007) (bending is a major life activity); *Mangus v. Metavante Corp.*, 2006 U.S. Dist. LEXIS 14441, *57 (E.D. Wis. 2006) (kneeling can be a major life activity); *Kriskovic v. Wal-Mart Stores*, 948 F. Supp. 1355, 1364 (E.D. Wis. 1996) (climbing stairs can be a major life activity).

The term "substantially" under the ADA means that an individual's limitations in a major life activity must be "considerable" or "to a large degree." *See Toyota*, 534 U.S. at 196. In order to be

11

"substantially limited," an individual must be "so limited in one or more major life activities that [he] is impaired in [his] ability to 'perform the variety of tasks central to most people's lives.'" *Rooney v. Koch Air, LLC*, 410 F.3d 376, 381 (7th Cir. 2005) (quoting *Toyota*, 534 U.S. at 201). To be "substantially limited" means that "the individual is either unable to perform, or significantly restricted as to the condition, manner or duration under which the individual can perform, a major life activity as compared to an average person in the general population." *Krocka v. City of Chicago*, 203 F.3d 507, 513 (7th Cir. 2000) (quoting *Davidson v. Midelfort Clinic, Ltd.*, 133 F.3d 499, 506 (7th Cir. 1998).

Impairments that interfere in only a minor way with the performance of manual tasks are not enough to establish disability. "[T]o be substantially limited in performing manual tasks, an individual must have an impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives." *Toyota*, 534 U.S. at 197-98. Furthermore, "[t]o be substantially limited in the major life activity of working . . . one must be precluded from more than one type of job, a specialized job, or a particular job of choice." *Sutton v. United Air Lines*, 527 U.S. 471, 492 (1999). "If jobs utilizing an individual's skills (but perhaps not his or her unique talents) are available, one is not precluded from a substantial class of jobs." *Id*.

Moreover, to be substantially limiting, an impairment cannot be a temporary medical condition, but must have an impact that is permanent or long term. *Toyota*, 534 U.S. at 197-98; *Waggoner v. Olin Corp.*, 169 F.3d 481, 484 (7th Cir. 1999). "In determining if an impairment is substantially limiting the court should consider: '(1) the nature and severity of the impairment, (2) the duration or expected duration of the impairment, and (3) the permanent or long term impact, or the expected permanent or long term impact of, or resulting from, the impairment.'" *Harrington v.*

12

*Rice Lake Weighing Sys.*, 122 F.3d 456, 459 (7th Cir. 1997) (quoting 29 C.F.R. § 1630.2(j)). "[T]he temporarily disabled are not protected by the Americans with Disabilities Act." *Matthews v. Commonwealth Edison Co.*, 128 F.3d 1194, 1197 (7th Cir. 1997).

A person is "disabled" under the "record of" definition if he 'has a history of, or has been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities.'" *Duda v. Bd. of Educ.*, 133 F.3d 1054, 1058 (7th Cir. 1998) (quoting 29 C.F.R. § 1630.2(k)). "[T]he intent of this 'record' definition of 'disability' is 'to ensure that people are not discriminated against because of a history of disability' or 'because they have been misclassified as disabled.'" *Id.* (quoting 29 C.F.R.§ 1630.2(k)). Moreover, in order for Klich to assert that he has a disability under the ADA because he had a "record of" impairment, Klich's condition must fall within the definition of impairment set forth in § 12102(2)(A). *Sinkler v. Midwest Prop. Mgmt. Ltd. Pshp.*, 209 F.3d 678, 683 (7th Cir. 2000). "What 12102(2)(B) requires is not simply a diagnosis, but a record reflecting the kind of impairment that would impose a substantial limitation on one or more of the plaintiff's major life activities." *Davidson v. Midelfort Clinic, Ltd.*, 133 F.3d 499, 510 (7th Cir. 1998).

As an initial matter, Klich is unable to establish that from the period of April 8, 2004 to the present he had a physical impairment that substantially limited one or more of his major life activities. Although Klich suffered from pain in his knees prior to his surgery, he does not contend that this pain continued to substantially limit any of his major life activities after his surgery. Simply stated, Klich's impairment was merely a temporary medical condition, which does not fall under the protection of the Americans with Disabilities Act. *See Mangus*, 2006 U.S. Dist. LEXIS at *59 (plaintiff with osteoarthritis was not substantially limited in walking, bending, and climbing stairs

13

after knee surgery improved her condition and she could negotiate the stairs, bend at the waist and the knees with support, stoop to pick up things, and used a cane only when necessary.).

Furthermore, Klich is also unable to establish that he has a record of an impairment. To be sure, Klich asserts that both he and his treating physician have attested to Klich's condition prior to the surgery, and that Gabe's management was aware that Klich needed knee replacements. It is unclear whether Klich has an actual record of impairment rather than simply a diagnosis, or whether Gabe's was aware of the specific limitations caused by Klich's physical condition beyond simply knowing that he needed knee surgery. However, even assuming that there is a record and that Gabe's was aware of the severity of Klich's knee problems, Klich is unable to establish a record of an impairment which is not temporary and which substantially limited a major life activity.

Klich's knee condition prior to surgery did not substantially limit any of his major life activities. He continued to work from August 2003 until January 2, 2004. His work duties remained essentially the same throughout this period. Although Klich experienced discomfort and some limitation of some major life activities, such as walking, sleeping, and bending, it was not to the extent that he was unable to "perform the variety of tasks central to most people's lives." *See Scheerer v. Potter*, 443 F.3d 916, 920 (7th Cir. 2006) (only "prolonged, severe and long-term sleep difficulties [] can amount to a substantial limitation in the major life activity of sleeping."); *EEOC v. Sears, Roebuck & Co.*, 417 F.3d 789, 802 (7th Cir. 2005) ("To be disabled with regard to the major life activity of walking, the employee must be 'substantially limited' in [his] ability to walk, and the limitation must be permanent or long term, and considerable compared to the walking most people do in their daily lives.").

Moreover, Klich's knee condition was only temporary. As noted above, when determining if a condition is substantially limiting, the court should also consider the duration of the impairment and the permanent or long term impact of the impairment. In the case at hand, Klich did not see a doctor regarding his knees until August 2003, and had surgery on January 12, 2004. Following the surgery and after taking time for recovery, Klich's knee condition improved significantly. Therefore, even if there is a record of impairment (i.e., Klich's knee condition), Klich's knee condition was only an impairment for a period of months, and did not have a permanent or long-term impact.

Although Klich is unable to establish that he has a disability under either 42 U.S.C. § 12102(2)(A) or 42 U.S.C. § 12102(2)(B), he can qualify as having a disability if Gabe's regarded him as having a disability. To be 'regarded as' having a disability, "a plaintiff must prove that either: (1) the employer mistakenly believes the employee has a physical impairment that substantially limits a major life activity; or (2) the employer mistakenly believes that an actual, nonlimiting impairment substantially limits a major life activity." *Nese*, 405 F.3d 638, 641 (7th Cir. 2005) (citing *Sutton*, 527 U.S. at 489). "If an individual can show that an employer or other covered entity made an employment decision because of a perception of disability based on 'myth, fear or stereotype,' the individual will satisfy the 'regarded as' part of the definition of disability." *Moore v. J.B. Hunt Transp., Inc.*, 221 F.3d 944, 954 (7th Cir. 2000) (quoting 29 C.F.R. Pt. 1630, App. § 1630.2(l) at 352 (1999)). In addition, in order to meet the "regarded as" prong of the definition, Klich must show that Gabe's was aware of his impairment. *Nese*, at 643.

Klich argues that Gabe's regarded him as disabled because of his history of disability, and because Gabe's believed that he could not climb, bend, kneel, or perform the other physical activities required of any of its positions. (Pl.'s Br. at 5.) Klich contends that Gabe's was aware of his

15

impairment because he provided Gabe's with a medical release which stated that he was released to return to work, and which documented a permanent restriction for no kneeling, and a permanent lifting restriction of not more than 50 pounds.

An employment decision does not violate the ADA unless the employer believed that the restrictions imposed by the plaintiff's doctor "constituted or revealed an impairment limiting enough to be a 'disability within the meaning of the Act.'" *Kupstas v. City of Greenwood*, 398 F.3d 609, 612 (7th Cir. 2005) (quoting *Tockes v. Air-Land Transp. Servs., Inc.*, 343 F.3d 895, 896 (7th Cir. 2003)). In regards to whether an impairment substantially limited an ability to perform the major life activity of working, the EEOC "has interpreted 'substantially limits' to mean 'significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities.'" *Id*. (quoting 29 C.F.R. § 1630.2(j)(3)(i)).

As stated above, for Gabe's to have regarded Klich as having a disability, Gabe's must have believed that Klich could not perform a broad range of jobs.[3] Klich has failed to present evidence suggesting that Gabe's believed that Klich could not perform jobs beyond those similar to his former job as a foreman.

To be sure, Klich has alleged that Gabe's believed that Klich could not perform any of its available positions. However, even assuming that Gabe's believed that Klich's physical limitations

---

[3]The court will focus on the major life activity of working, rather than the major life activities of walking, bending, using stairs or climbing, and sleeping. Although Klich could qualify as having a disability if Gabe's regarded him as being substantially limited in walking, bending, using stairs or climbing, or sleeping, Klich's argument is that Gabe's, taking into account Klich's various impairments, regarded Klich as being unable to work due to these impairments. Klich does not contend that Gabe's believed that Klich's limitations in walking, bending, using stairs or climbing, or sleeping were permanent or long term, and substantial compared to the average person.

16

due to his knee surgery prevented him from performing any of Gabe's available positions, Klich is unable to establish that Gabe's regarded him as disabled.

In *Kupstas*, a truck driver/laborer who worked for the city injured his back and was placed on a 55-60 pound lifting restriction, a two hour limit for continuous shoveling or raking, and a four hour limit for shoveling or raking per day. 398 F.3d at 611. The employee was terminated after the city determined he was no longer qualified for the truck driver/laborer position, and after the city was unable to find other positions in other city departments for which the employee was qualified. *Id*. The court held that the city did not regard the employee as having a disability because the employee failed to present sufficient evidence that the city regarded him as having an impairment that rendered him unable to work in a class or broad range of jobs. *Id*. at 615.

The court in *Kupstas* first noted that the employee could not meet his burden by showing that the city believed that he could not perform a specific job, namely a truck driver/laborer position. *Id*. at 615-16. The court noted that even if the city viewed the employee's work restrictions as an impairment that prevented him from performing his duties, "we have held that more serious restrictions do not substantially limit one's general ability to work." *Id*. at 613; citing *Peters v. City of Mauston*, 311 F.3d 835, 844 (7th Cir. 2002) (finding no substantial limitation to the employee's ability to perform the major life activity of working where the employee was unable to lift over 50 pounds, shovel for more than 30% of a workday, or use of his shoulder for over 2 hours continuously or 6 hours in a workday); *Contreras v. Suncast Corp*., 237 F.3d 756, 763 (7th Cir. 2001) (finding not even a "hint" that the employee was precluded from a broad class of jobs where he could not lift over 45 pounds, do "strenuous work," or drive a forklift for over 4 hours in a workday).

17

Moreover, the court stated that even if "the city believed that he was not physically able to perform any job with the city, it does not follow that the city believed that [the employee's] impairments made him unable to perform a broad range of jobs." *Id*. at 615. The employee had failed to present "evidence of the number, nature, or qualifications of other jobs with the city." *Id*. As a result, the court found that there was "no evidence that the city employed workers in a broad range of jobs." *Id*.

In the case at hand, Klich has provided evidence that Gabe's did not believe Klich could perform his job duties because of his work restrictions. As noted by Klich, the testimony of Gabe's president and CEO, Timothy Gabrielse, indicates that Klich needed to be completely free from restrictions in order for him to return to work performing his previous duties:

> Q: Is it the company's position that Mr. Klich needed to be free of any kneeling or lifting restrictions to be able to come back and do his previous job duties?
>
> A: And also concerned with the ability to go up and down the stairs. As you know, going in and out of ditches, that's what we do for a living, Ma'am, and that's very treacherous.

(T. Gabrielse Dep. at 39-40.)

However, Gabrielse's deposition testimony indicates that he believed that Klich could still perform some type of work given his restrictions. Gabrielse testified that "had we had work that [Klich] could perform with restrictions that were provided to us we would have put him back to work." (T. Gabrielse Dep. at 14.) Further, Gabrielse stated that he had conversations with Greg Gabrielse about the possibility of bringing Klich back to do light duty work but that there was no light duty work available. (T. Gabrielse Dep. at 25-26). Gabrielse rejected the notion that Klich "could not do any work at Gabe's unless he had absolutely no restriction whatsoever." *Id*. (T. Gabrielse Dep. at 14.)

18

Given the evidence that Gabe's believed that Klich could work in a capacity other than his former job, and the lack of evidence which would indicate the contrary, Klich is unable to establish that Gabe's believed he was unable to perform a broad range of jobs. Simply stated, evidence of Gabe's belief that Klich's restrictions precluded from returning to his old job or similar jobs does not constitute sufficient evidence that Gabe's believed Klich's impairment precluded him from working in a class or broad range of jobs.

The net result of the foregoing is that Klich has failed to present sufficient evidence that his condition qualifies as a disability within the meaning of the ADA. Such being the case, it is unnecessary for the court to examine whether Klich was a "qualified" individual with a disability, or whether Gabe's failed to engage in the interactive process. Moreover, because Klich is unable to establish a prima facie case, it is unnecessary to address whether Klich's alleged disability was a motivating factor in Gabe's alleged adverse employment action.

## B. Family and Medical Leave Act

In 1993, Congress enacted the FMLA "to balance the demands of the workplace with the needs of families, . . . to entitle employees to take reasonable leave for medical reasons, . . . [and] to accomplish the[se] purposes . . . in a manner that accommodates the legitimate interests of employers." 29 U.S.C. § 2601(b). In 1995, the Department of Labor issued its final regulations, which were an attempt to reasonably balance these interests and to promote compliance with the FMLA.

The FMLA provides that "an eligible employee shall be entitled to a total of 12 workweeks of leave during any 12-month period . . . [b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1).

19

Thus, to be afforded protection under the FMLA, a plaintiff must have suffered from a "serious health condition." *See Price v. City of Fort Wayne*, 117 F.3d 1022, 1023 (7th Cir. 1997). A serious health condition includes "an illness, . . . or physical or mental condition that involves . . . a period of incapacity (i.e. , inability to work . . . due to the serious health condition, treatment therefor, or recovery therefrom), of more than three consecutive calendar days, and any subsequent treatment or period of incapacity relating to the same condition, that also involves . . .[t]reatment by a health care provider on at least one occasion which results in a regimen of continuing treatment under the supervision of the health care provider." 29 C.F.R. § 825.114(a)(2). "An employee is 'unable to perform the functions of the position' where the health care provider finds that the employee is unable to work at all or is unable to perform any one of the essential functions of the employee's position within the meaning of the Americans with Disabilities Act. (ADA), 42 U.S.C. § 12101, et seq., and the regulations at 29 C.F.R. § 1630.2(n)." 29 C.F.R. § 825.115.

Title 29 U.S.C. § 2613 provides that an employer may require that an employee's request for leave because of a serious health condition that makes the employee unable to perform the functions of his position "be supported by a certification issued by the health care provider of the eligible employee." 29 U.S.C. § 2613(a). That statutory section also provides that "[t]he employee shall provide, in a timely manner, a copy of such certification to the employer." *Id.* In turn, 29 C.F.R. § 825.305(b) provides as follows:

> (b) When the leave is foreseeable and at least 30 days notice has been provided, the employee should provide the medical certification before the leave begins. When this is not possible, the employee must provide the requested certification to the employer within the time frame requested by the employer (which must allow at least 15 calendar days after the employee's request), unless it is not practicable under the particular circumstances to do so despite the employee's diligent, good faith efforts.

20

A medical certification in the case of an employee claiming to be unable to perform the functions of his position is sufficient if it states (1) the date on which the serious health condition commenced, (2) the probable duration of the condition, (3) the appropriate medical facts within the knowledge of the health care provider regarding the condition, and (4) a statement that the employee is unable to perform the functions of the position of the employee. 29 U.S.C. § 2613(b).

At the time the employer requests a medical certification, the employer must also advise an employee of the anticipated consequences of an employee's failure to provide an adequate medical certification. 29 C.F.R. § 825.305(d). Moreover, the regulations provide that "[t]he employer shall advise an employee whenever the employer finds a certification incomplete, and provide the employee a reasonable opportunity to cure any such deficiency." *Id.*

The regulations also provide that "[a]n employee shall provide at least verbal notice sufficient to make the employer aware that the employee needs FMLA-qualifying leave, and the anticipated timing and duration of the leave." 29 C.F.R. § 825.302(c). However, "[t]he employee need not expressly assert rights under the FMLA or even mention the FMLA, but may only state that leave is needed for an expected birth or adoption, for example." *Id.* Further, "[t]he employer should inquire further of the employee if it is necessary to have more information about whether FMLA leave is being sought by the employee, and obtain the necessary details of the leave to be taken." *Id.*

In addition, "[a]n employer may also require an employee to comply with the employer's usual and customary notice and procedural requirements for requesting leave." 29 C.F.R. § 825.302(d). "However, failure to follow such internal employer procedures will not permit an employer to disallow or delay an employee's taking FMLA leave if the employee gives timely verbal or other notice." *Id.*

The FMLA provides that "[i]t shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this title [29 U.S.C. § 2611 *et seq.*]." 29 U.S.C. § 2615(a)(1). In turn, § 2617 provides that any employer who violates 29 U.S.C. § 2615 shall be liable to "any eligible employee affected" for certain defined damages, interest on such damages, liquidated damages, and appropriate equitable relief, including employment, reinstatement, and promotion, together with reasonable attorneys' fees, expert witness fees and costs. 29 U.S.C. § 2617(a)(1)(A), (1)(B), (3).

In support of its motion for summary judgment Gabe's first argues that Klich did not take family medical leave, as covered by the Act, because Klich never requested a family medical leave of absence. Specifically, Klich contends that Klich never filled out any family medical leave forms or applications, did not provide Gabe's with any family medical leave paperwork, and did not make any oral or written requests for family medical leave. Moreover, Gabe's notes that Klich checked a box indicating "Layoff (Lack of Work)" on a lay off slip effective January 2, 2004. (Klich Dep., Ex. 3.)

Gabe's also points to its employee handbook, which outlines its requirements for employees who wish to take medical leave:

> A health care provider's statement must be submitted verifying the need for medical leave and its beginning and expected ending dates. Any changes in this information should be promptly reported to Gabe's Construction Co., Inc. Employees returning from medical leave must submit a health care provider's verification of their fitness to return to work.

(T. Gabrielse Second Aff., Ex. A, p. 29.)

In response, Klich argues that he provided Gabe's with notice of his need to take medical leave due to his knee surgery. Klich points to the deposition testimony of Timothy Gabrielse, who

22

acknowledged that in January, he was aware that Klich was going to miss time at work due to his knee replacement surgery. (T. Gabrielse Dep. at 18-19.)

As an initial matter, the parties do not dispute that Klich's medical condition was sufficiently severe to qualify for FMLA protection. Moreover, Klich's failure to complete the proper paperwork and follow Gabe's internal procedures for applying for medical leave does not necessarily preclude him from protection under the FMLA. Although FMLA regulations provide that Gabe's can require Klich to follow certain internal procedures, Gabe's could not disallow FMLA leave for failure to follow these procedures if Klich gave timely notice to Gabe's.

Such being the case, the primary issue in determining whether Klich was entitled to FMLA protection is whether Klich provided "notice sufficient to make the employer aware that the employee needs FMLA-qualifying leave, and the anticipated timing and duration of the leave." 29 C.F.R. § 825.302(c).

"[T]he employee's duty is merely to place the employer on notice of a probable basis for FMLA leave." *Aubuchon v. Knauf Fiberglass, GMBH*, 359 F.3d 950, 953 (7th Cir. 2004). Once the employee has given "the employer enough information to establish probable cause . . . [t]hat is enough to trigger the employer's duty to request such additional information from the employee's doctor or some other reputable source as may be necessary to confirm the employee's entitlement." *Id*.

In *Cavin v. Honda of Am. Mfg.*, an employee informed his employer that he had been at the hospital, that he was unable to work due to his injury, and that he would return to work the next day. 346 F.3d 713, 725 (6th Cir. 2003). The employee only informed security of his injury and inability to work. *Id*. at 725. The court held that although the employee did not use the word "leave" or the

23

phrase "leave of absence," "[v]iewing the facts in the light most favorable to [the employee], [the employer] was on notice and had a duty to collect additional information from [the employee] that would be necessary to make his leave comply with FMLA requirements. *Id*. at 726.

In viewing the facts in the light most favorable to Klich, I am persuaded that he provided sufficient notice of a probable basis for FMLA leave. As an initial matter, Klich's failure to specifically request FMLA leave does not automatically preclude a finding of a probable basis for FMLA leave. As stated above in the FMLA regulations, Klich need not expressly assert his rights under the FMLA or even mention the FMLA, but rather may simply state that leave was needed for his medical condition.

Klich has presented sufficient evidence to indicate that Gabe's was aware that he intended to go on leave specifically for his medical condition. Klich notified Gabe's of his need for surgery, and that he would be having surgery and recovering during his leave of absence after the layoff. Klich informed his supervisor, Kenny Gabrielse, that he was going to have knee surgery prior to his laying himself off. (Klich Dep. at 39.) Klich also told Greg Gabrielse of his impending surgery by handing Greg Gabrielse a worksheet in November indicating that surgery was going to be scheduled for his knee, although the exact date was not specified. (Klich Dep. at 34, Ex. 2). Moreover, as noted above, Timothy Gabrielse acknowledged that in January, he was aware that Klich was going to miss time at work due to his knee replacement surgery.

To be sure, Klich did indicate that he was laying himself off partly because there was no work available. Indeed, Klich acknowledged that he decided to lay himself off and have surgery because it was a good time, as there was no work available and he would have probably laid himself off even if he did not require surgery. (Klich Dep. at 41-42.) Klich testified that he spoke with Kenny

24

Gabrielse about laying himself off and the lack of work available. (Klich Dep. at 39.) Klich cleared

his lay off with Kenny Gabrielse, who verified that there was no work for Klich to do at that time.

Klich stated that it was common practice for the foreman to lay himself off of work each year once

there was no work to be done, after first verifying with his supervisor that there was no work. (Klich

Dep. at 41.)

However, these circumstances do not indicate that Gabe's was not aware that Klich intended

to lay himself off in order to have surgery, and that he would return once he recovered. Although

Klich checked to make sure there was no work available before laying himself off, he also made clear

to Gabe's that he was going to have surgery and would be unable to work during his recovery time.

Klich followed standard procedures for laying himself off due to lack of work, but Gabe's was aware

that this situation was different due to his extended inability to work because of surgery. Unlike a

regular lay off period, Klich was not planning on returning once work became available, but rather

once he was physically able to return to work. Consequently, Klich has presented sufficient evidence

to demonstrate that, by notifying Gabe's of his surgery, he provided notice to Gabe's that he was

requesting leave protected under the FMLA to have surgery, rather than the usual leave he would take

when he would lay himself off for lack of work.

Moreover, Gabe's knew that Klich intended to return to work, and monitored Klich's

recovery progress after Klich submitted medical release forms with restrictions. (T. Gabrielse Dep.

at 22, 31.) Although Klich did not tell Gabe's when he would return to work at the time of his layoff,

he did provide an indication that he would return to work once he had recovered from surgery. While

this is not a definite time frame, it is also not an indefinite period.

25

In sum, Klich provided notice to Gabe's that he was requesting FMLA leave. Nevertheless, even assuming that Klich was entitled to protection under the FMLA, Gabe's did not violate Klich's rights by not returning him to his prior position.

An eligible employee who takes leave under the FMLA is entitled, on return from such leave:

(A) to be restored by the employer to the position of employment held by the employee when the leave commenced; or

(B) to be restored to an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment.

29 U.S.C. § 2614(a)(1).

However, there are limitations to this right of restoration under the FMLA:

(3) Limitations. Nothing in this section shall be construed to entitle any restored employee to . . .

(B) any right, benefit, or position of employment other than any right, benefit, or position to which the employee would have been entitled had the employee not taken the leave.

29 U.S.C. § 2614(a)(3).

Moreover, FMLA regulations provide guidelines for when a covered employer may refuse to provide FMLA reinstatement to an eligible employees:

(d) An employee has no greater right to reinstatement or to other benefits and conditions of employment than if the employee had been continuously employed during the FMLA leave period. Thus, *an employee's rights to continued leave, maintenance of health benefits, and restoration cease under FMLA if and when the employment relationship terminates (e.g., layoff),* unless that relationship continues, for example, by the employee remaining on paid FMLA leave. If the employee is recalled or otherwise re-employed, an eligible employee is immediately entitled to further FMLA leave for an FMLA-qualifying reason. An employer must be able to show, when an employee requests restoration, that the employee would not otherwise have been employed if leave had not been taken in order to deny restoration to employment. (See § 825.216.)

26

29 CFR § 825.312(d) (emphasis added); *see also Ilhardt v. Sara Lee Corp.*, 118 F.3d 1151, 1157 (7th Cir. 1997) ("an employer's responsibility to continue FMLA leave and restore an employee '"cease at the time the employee is laid off."'") (quoting 29 CFR § 825.216(a)(1)).

Gabe's argues that because Klich was an employee of the Steamfitters union and was not an employee of Gabe's, Klich was not entitled to a position at Gabe's either prior to or after his surgery. As such, Klich was not entitled to return to employment at any particular job, but rather was only entitled to be returned to the union list for consideration in hiring. Requiring Gabe's to place Klich on a project after his surgery would be providing greater rights and benefits of employment than Klich was entitled to prior to his surgery. (Def.'s Reply Br. at 8.) Further, Gabe's argues that, because Klich laid himself off, he lost his right to restoration.

Finally, Gabe's contends that the FMLA does not preclude an employer from taking an adverse employment action for a reason other than taking leave. In the case at hand, according to Klich, Gabe's did not restore Klich to his original position because there was simply no position available to him. (Def.'s Reply Br. at 9.)

I conclude that Klich has not presented sufficient evidence to demonstrate that Gabe's violated his right to restoration under the FMLA by not immediately rehiring him once he turned in his medical release. As noted above, Klich was an employee of the Steamfitter's union, and was not an employee of Gabe's. Indeed, when Klich received his medical release, he soon thereafter placed himself on the union list for consideration in hiring by all union employers.

Moreover, despite his long-term working relationship with Gabe's, Gabe's did not have a duty under the FMLA to provide to Klich greater rights after his surgery than he was entitled to before his surgery. Gabe's merely had a duty to consider Klich for available positions after his

27

surgery.  Klich did not have a permanent position with Gabe's, but rather was hired by Gabe's when work became available.  Gabe's has presented evidence that it considered Klich for available positions, and did not hire Klich because of his medical restrictions.

Moreover, Klich did not have a position with Gabe's after he laid himself off, and he needed to be rehired by Gabe's once there was available work.  Further, there was no available work for Klich when he laid himself off, so his position no longer existed even if Klich did not lay himself off.  Gabe's did not have a duty to restore Klich to a position which no longer existed both after his layoff and after Klich had finished performing all available work.

In sum, the undisputed material evidence demonstrates that Gabe's allowed Klich to go on leave while he was recovering from surgery, and that Gabe's considered him for open positions when Klich notified Gabe's he was ready to return from his leave.  Klich has failed to present evidence to demonstrate that Gabe's failed to perform any of its duties as required by the FMLA.

Klich also alleges that Gabe's retaliated against him for exercising his rights under the FMLA.  To establish a prima facie case for retaliation, the plaintiff must show that: "(1) the plaintiff engaged in a protected activity; (2) the employer took adverse employment action against the employee; and (3) there is a causal connection between the employee's protected activity and the employer's adverse employment action." *King v. Preferred Tech. Group*, 166 F.3d 887, 892 (7th Cir. 1999).  "To demonstrate the 'causal link,' the employee must demonstrate that the employer would not have taken the adverse employment action but for the employee's protected activity." *Id*.  The element of causal connection "may be satisfied by reference to the temporal proximity between [the employee's] taking of the protected leave and [his] termination." *Id.* at 893.  "'Generally, a plaintiff

may establish such a link through evidence that the discharge took place on the heels of protected activity.'" *Id*. (quoting *Dey v. Colt Constr. & Dev. Co.*, 28 F.3d 1446, 1458 (7th Cir. 1994)).

Once the plaintiff establishes a prima facie case, "the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse employment action." *Id*. If the defendant carries this burden of production, "the burden then shifts back to the employee to show that the employer's proffered reasons are pretextual and that its actual reason was discriminatory or retaliatory." *McClendon v. Indiana Sugars, Inc.*, 108 F.3d 789, 797 (7th Cir. 1997).

Gabe's argues that Klich cannot establish a prima facie case for retaliation. Specifically, Gabe's contends that, even if Klich meets the first two prongs, the temporal proximity between Klich's leave and Gabe's alleged failure to find him work is insufficient to establish a causal connection between the two events. Moreover, Gabe's contends that there is insufficient evidence to show that Gabe's reasons for not finding him work are pretextual.

As discussed above, Klich engaged in a protected activity, as he provided sufficient notice to Gabe's that he was requesting leave under the FMLA. Turning to the second prong, it is questionable whether Gabe's took an adverse employment action against Klich, as it did not formally discharge Klich. Instead, Gabe's did not hire him due to its belief that he was not qualified for any available positions. Assuming *arguendo*, however, that Klich can meet the first two prongs of a prima facie retaliation case, it is my opinion that the temporal proximity between Klich's handing in his return to work slip and Gabe's refusal to re-hire him could establish a causal link between the two events. Nevertheless, even assuming that Klich can establish a prima facie case, he is unable to show that Gabe's proffered reasons for its action are pretextual and that its actual reason for not finding a position for him was in retaliation for his taking FMLA leave.

Gabe's asserts that it did not hire Klich because there were no available positions for which Klich was qualified, taking into consideration various factors including his work restrictions. Klich has failed to present any evidence to cast doubt upon this explanation, or suggest that retaliation was the real motivation behind Gabe's decision to not assign Klich to a project. Indeed, given that a layoff was customary practice each year when no work was available, it would make no sense that Gabe's would retaliate against an employee for taking leave during a period in which no work was available.

The bottom line, in my opinion, is that Gabe's did not violate 29 U.S.C. § 2615(a)(1) by interfering with, restraining, or denying Klich's exercise of or his attempt to exercise his rights under the FMLA. Klich has failed to provide evidence to demonstrate that Gabe's failed to properly restore him to the position of employment held when the alleged FMLA leave commenced, or that Gabe's retaliated against Klich for exercising his rights under the FMLA.

## C. Age Discrimination in Employment Act

The ADEA provides that it shall be unlawful, "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). In order to prevail on a claim under § 623(a)(1), a plaintiff must show that the protected trait actually motivated the employer's decision, that is, the plaintiff's age must have actually played a role in the employer's decision-making process and had a determinative influence on the outcome. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 141 (2000); *Schuster v. Lucent Technologies, Inc.*, 327 F.3d 569, 573 (7th Cir. 2003). Such a claim may be proven through direct evidence of the employer's discriminatory motive, or through the indirect, burden-shifting approach articulated by

30

the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *see Schuster*, 327 F.3d at 573.

The plaintiff in this case does not attempt to prove a discriminatory motive through direct evidence, but relies on the indirect *McDonnell Douglas* burden-shifting method of proof. Under the indirect method, Klich must first establish a prima facie case by showing that: (1) he is a member of the protected class; (2) he applied for and was qualified for the position he sought; (3) Gabe's rejected him; and (4) Gabe's hired another similarly situated individual for the position who was substantially younger than Klich. *Zaccagnini v. Chas. Levy Circulating Co.*, 338 F.3d 672, 675 (7th Cir. 2003).

If the plaintiff succeeds in making out a prima facie case, the burden then shifts to the employer to articulate some legitimate, nondiscriminatory reason for the adverse employment action. *Schuster*, 327 F.3d at 574. If such a reason is offered, the plaintiff bears the ultimate burden of showing that it is a pretext for discrimination. *Id*.

As an initial matter, Klich is able to establish a prima facie case of age discrimination. Klich is a member of the protected class, applied for and was qualified for the foreman position, was rejected by Gabe's, and Gabe's hired younger individuals for open foreman positions. Indeed, Gabe's does not directly contest that Klich has provided sufficient evidence to make out a prima facie case of age discrimination.

However, Gabe's has articulated a legitimate, nondiscriminatory reason for the adverse employment action. Namely, Gabe's has asserted that it evaluated Klich for each available position, and after considering various factors including the requirements of union contracts, Klich's skills,

31

his work restrictions, his qualifications, and his licenses and certifications, Gabe's was unable to find a position for Klich from April 8, 2004 until the time he retired. (Def.'s Reply Br. at 11.)

Such being the case, Klich has the burden of showing that Gabe's proferred reason is a pretext for discrimination. In order to establish pretext, Klich must show either that Gabe's was motivated by a discriminatory reason or that Gabe's proffered reason is unworthy of credence. *Zaccagnini*, 338 F.3d at 676. Klich may thus "avoid summary judgment by pointing to specific facts that place [Gabe's] explanation in doubt." *Id*.

"The pretext inquiry focuses on whether the employer's stated reason was honest, not whether it was accurate." *Helland v. South Bend Community Sch. Corp.*, 93 F.3d 327, 330 (7th Cir. 1996). Even if Gabe's reasons for not hiring Klich were "mistaken, ill-considered or foolish," if Gabe's "honestly believed in those reasons then pretext has not been proven." *Crim v. Board of Educ.*, 147 F.3d 535, 541 (7th Cir. 1998).

Klich argues that Gabe's explanation that there was no work available that Klich could perform is not credible. Klich points to the sixteen individuals Gabe's assigned to foreman positions during the period of April through December of 2004, and notes that thirteen of these individuals were significantly younger than Klich, two had unknown ages, and only one was not younger than Klich. (Pl.'s Br. at 13-14.) Klich also notes that all of the employees had worked for Gabe's for significantly less time than had Klich. Moreover, Klich contends that Gabe's brought in a younger employee with less seniority than Klich from the Green Bay shop to weld in the Sheboygan shop, where Klich normally performed his shop welding.

After due consideration, I conclude that Klich is unable to point to specific facts that place the truth of Gabe's explanation for its action in doubt. The principal piece of evidence upon which

32

Klich relies in his attempt to prove pretext is a set of statistics indicating that Gabe's hired younger individuals for positions that Klich was either equally, or more, qualified to hold.[4]  However, pointing to statistics is generally insufficient in itself to establish pretext.  "Although statistical evidence can be relevant to prove a pattern or practice of discrimination, it is not usually sufficient in itself."  *Balderston v. Fairbanks Morse Engine Div. of Coltec Indus*., 328 F.3d 309, 319 (7th Cir. 2003).  "Our court generally has not found that statistical evidence concerning terminated employees, without more, is relevant to our analysis of whether the articulated reasons for discharging [a] plaintiff were pretextual or discriminatory."  *Adreani v. First Colonial Bankshares Corp*., 154 F.3d 389, 400 (7th Cir. 1998);  "Statistical evidence must also take 'into account nondiscriminatory explanations.' *Id.*  (quoting *Radue v. Kimberly-Clark Corp*., 219 F.3d 612, 616 (7th Cir. 2000)); *see also Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1283 (10th Cir. 2000) (to "raise a triable issue of fact regarding pretext, the statistics 'must show a stark pattern of discrimination unexplainable on grounds other than age.'"; quoting *Rose v. Wells Fargo & Co.*, 902 F.2d 1417, 1423 (10th Cir. 1990)).

To be sure, Klich's statistics indicating the hiring of younger individuals support Klich's contention that there were open positions during the period that Klich was seeking to return to work.  However, Gabe's does not contend that there was no work available in general.  Rather, Gabe's argument is that there was no work available for an individual with Klich's qualifications, including his medical restrictions.  As detailed above with the deposition testimony of Timothy Gabrielse, one

_____

[4]Although not argued in his brief, Klich also previously noted that he heard through the grapevine that a member of Gabe's management told another member of management that "we got to get younger people in our company."  This comment was allegedly relayed to Klich by another Gabe's employee.  (Def.'s Br. at 12.)  However, as this is the only comment cited by Klich, this comment is insufficient "particularly standing alone as the only statement regarding age as a determining factor, to allow a finding of pretext."  *Balderston*, 328 F.3d at 324.

33

of the primary reasons Klich was not given back his old position was because his medical release still contained restrictions. (T. Gabrielse Dep. at 39-40.) In sum, Gabe's has presented evidence that it did not hire Klich because it believed that Klich was not qualified due to his medical restrictions, and has consistently reiterated this explanation.

To be sure, Klich contends it to be undisputed that he was qualified for the foreman position, because both he and his physician attest that he was able to satisfactorily perform his job before the knee surgery, and the knee surgery made him more physically able to perform his job duties. (Pl.'s Br. at 14.) However, whether Klich was actually qualified for the foreman position is not determinative to the question of whether Gabe's *believed* he was qualified for the position. As stated above, the pretext inquiry focuses on whether Gabe's stated reason of its action was honest, not on whether it was accurate. Even if Gabe's mistakenly believed that Klich was unable to perform his job duties due to his medical restrictions, if Gabe's honestly believed Klich could not perform his job duties, then pretext has not been shown.

The ADEA "protects, as a practical matter, the imperfect older worker from being treated worse than the imperfect younger one." *Shager v. Upjohn Co.*, 913 F.2d 398, 403 (7th Cir. 1990). As such, "we are engaged in a search for evidence that age tipped the balance from one imperfect, younger employee to another, less imperfect, older employee." *Testerman v. EDS Tech. Prods. Corp.*, 98 F.3d 297, 304 (7th Cir. 1996). Klich has presented evidence that he had substantially more years of experience with Gabe's than the younger employees. However, this does not necessarily demonstrate that Klich was more qualified for the positions than the younger employees. More particularly, Gabe's has asserted that Klich's work restrictions caused him to be unqualified for the positions, and Klich has not presented any evidence to show that any of the younger employees were

34

under medical restrictions similar to those that Klich was under. Moreover, Klich has presented evidence that one employee, Larry Snyder, was the same age as Klich and was hired despite the fact that he had worked at Gabe's for 31 fewer years than Klich. This cuts directly against Klich's argument that younger employees were hired, despite their inferior qualifications, because they were younger. Instead, this older employee's hiring supports Gabe's contention that its failure to hire Klich was not based on his age, but rather was because of his medical restrictions.

Such being the case, Klich's mere reliance on statistics does not discredit Gabe's explanation that Klich was not hired because he was not qualified for an open position. As a result of his medical restrictions Klich had different qualifications than the individuals who were ultimately hired. Klich has not presented any evidence indicating that any of the other, younger employees were operating under similar medical restrictions. The statistical evidence presented by Klich takes into account the hired employees' age and work experience, but fails to address the issue of medical restrictions, which forms the primary basis for Gabe's explanation. Consequently, Klich has failed to present sufficient evidence to prove that Gabe's legitimate, nondiscriminatory reasons for not finding a position for Klich were pretextual. Summary judgment is thus appropriate.

### IV. CONCLUSION

In conclusion, and for all of the foregoing reasons, the defendant's motion for summary judgment on the plaintiff's ADA claim, FMLA claim, and ADEA claim are granted. As these claims comprise the whole of the complaint, this action will be dismissed.

**NOW THEREFORE IT IS ORDERED** that the defendant's motion for summary judgment be and hereby is **GRANTED**;

**IT IS FURTHER ORDERED** that this action be and hereby is **DISMISSED**;

35

**IT IS FURTHER ORDERED** that the Clerk of Court shall enter judgment accordingly.

**SO ORDERED** this <u>20th</u> day of February 2007, at Milwaukee, Wisconsin.

<u>/s/ William E. Callahan, Jr.</u>
WILLIAM E. CALLAHAN, JR.
United States Magistrate Judge